The first case is Agbortabi v. United States. Mr. Duva. Good morning, Your Honor. Good morning. Could I please the Court? I'm requesting five minutes' rebuttal. Fine. Thank you. My name is Raymond Duva, and I represent the petitioner in this matter. He's a native and citizen of the Republic of Cameroon. He's currently detained in Hudson County Correctional Facility since August of 2001. The petition for review in this matter is a petition which is appealing the decision of the Board of Immigration Appeals in Mr. Agbortabi's case in which the Board of Immigration Appeals, the BIA, made a determination that the factual findings of the immigration judge, particularly the credibility finding of the immigration judge, was clearly erroneous. The regulation outlining and limiting the scope of review of the BIA since 2002, when the change was made, limits that scope to a finding of clearly erroneous. The position of the petitioner here is that the Board actually did a de novo review of the factual findings of the immigration judge, which was improper, and that this Court should reverse that decision. Although we already sent this back to the BIA and said, did you not do this de novo, and they said, no, we did not. We have that statement from them. What do we make of that? Well, that's what the BIA said. However, what the BIA actually did was looked at, essentially what it comes down to is the report of the consular investigations assistant, the CIA, as it's referred to in the briefs. The BIA analyzed that report in great detail. That was the report that supposedly said that the documents were fraudulent? That's correct. It's the report that said that the two documents, the convocation and the warrant of arrest, were fraudulent. It's also the report that said that the newspaper which published the article, which the petitioner produced at the immigration hearing, in fact existed. And also the same report that said that the affidavit prepared by the petitioner's counsel in Cameroon was actually executed by the attorney for the petitioner in Cameroon. What the BIA did was, in the opinion of the petitioner, substituted its determination for the determination of the immigration judge, and in that respect engaged in de novo review of the facts. Did the immigration judge ever make any ruling on this new information that found these documents fraudulent, or was this solely done by the BIA? The immigration judge was asked on one of the remands back to the… The answer would be no. The immigration judge did not have an opportunity to again consider the decision or determination by the BIA that in its opinion the documents were fraudulent. Normally it would be the fact finder, the IJ, who would make this kind of determination, but instead in this case it was the BIA who made this determination. Do I understand the case correctly? Yes. Except that the IJ did consider this evidence, and said, and opined as to this additional evidence, and specifically as to the existence of the newspaper, said, and this is at 69, one of the editors that was consulted acknowledged the newspaper name and pointed out the area in which it was circulated the most. This honest statement is significant, since the court now addresses the question whether the article in reality explains the truthfulness of the facts, and then assuming the article is veridical, my conclusions in my decision of May 23rd appear to still be applicable. An article about the respondents' activities in a public newspaper in a country like Cameroon has to be significant. So the IJ did address the significance of the evidence. Yes. Maybe I misunderstood the question, but I don't think that the IJ ever had an opportunity to revisit those issues after the BIA determined in its opinion that the documents were fraudulent. Wasn't the case sent back to the IJ specifically to consider the consular report? Yes. In fact, the consular report was issued after the case had already first gone to the BIA, and the government requested a remand back to the IJ to give him an opportunity to review the consular report. And the IJ found the alien credible after considering the contents of the report? That's correct. And what did the government offer in rebuttal or to undermine the additional evidence at the time that it went back to the IJ? Well, the government offered the report itself, the CIA report. But, I mean, aren't the BIA's findings that it was fraudulent? Was that evidence before the IJ? The case never went back to the IJ after the BIA determined that, in its opinion, that the documents were fraudulent. That was one of the questions, I guess, addressed by the BIA the last time it had this case in terms of whether or not it should remand the case back to the IJ after it had made a finding of clearly erroneous decision-making on the part of the IJ. Should we send this back? If we were to agree with you, would we send this back or would we say the BIA did something wrong in substituting its judgment and, therefore, just flat-out reversing the BIA? We're requesting that the court recognize that the BIA went beyond the scope of its review. It did not limit itself to clearly erroneous and substituted its decision for the IJ and asked the court to reverse the decision of the BIA and grant the application. In the alternative, if the court believes that the error on the part of the BIA was failing to remand the case, once it had made a finding that the judge was clearly erroneous, it should have remanded the case back to the judge with instructions, then we would ask that the court issue an order directing the BIA to do so. The case is going back and forth. It looks like both sides seem to be quite entrenched in their views and maybe the BIA was a little bit flustered with the IJ's decisions. Couldn't it, under those circumstances, come to its own conclusion? It had concluded there was clear error and, by implication, it felt that the reports were fraudulent. Why couldn't it come to that conclusion to dispose of the case? Well, it could have. However, first of all, I don't believe that there was sufficient basis for it to have made the finding that there was clear error. In order for it to have made that finding, it would have had to have found, as is in the federal court system, that no reasonable person could have come to the conclusion that the petitioner was entitled to or should be granted asylum. So your view is that not only did the BIA exceed its authority, but that its initial finding of clear error was wrong? Correct. It didn't act on the basis of clear error as it should have. It improperly applied the idea of clear error. It basically substituted its own determination. We have to, of course, defer to the BIA. Assuming that we agree with the clear error conclusion, your view is that we should send the case back to the BIA to do what? To send it back to the IJ? If this court agrees that the BIA was correct in its finding of clear error, yes. To send it back to the IJ, even though it's been back to the IJ on numerous occasions, the fact that it has should not allow the BIA to nonetheless go beyond its authority. We understand that you would like an outright reversal, but let's explore the remand a bit. I gather that the IJ already ruled on the information that the BIA relied on to make the reversal. Or am I incorrect about that? That is, if we sent it back to the IJ, what would we be asking the IJ to do? To consider new information or information that it hadn't considered before? Or to reconsider what it had already decided? We'd be reconsidering the case and his finding that the petitioner should be granted asylum in light of the BIA's finding. And if you read the BIA's decision, he's finding the judge's determination on the petitioner's credibility to be clearly erroneous, but not necessarily other factual findings of the immigration judge. So the immigration judge would presumably have to consider the case in the light of that determination. But clearly the rules do not allow the BIA to engage in an overall review of factual findings. The BIA made a finding in terms of the IJ's decision on the petitioner's credibility only. Does the case rise and fall in credibility, or is it the weight to be given in the documents that were introduced in evidence in the consular report? Weight should be given to the documents, which the consular report actually corroborated with respect to two of the documents. Weight should also be given to the fact that because the government of the United States violated its own limitations in terms of confidentiality in conducting this investigation abroad, the petitioner is now at greater risk because of that violation than he was prior to the investigation. And the rules that govern the conduct of the United States government say that if an officer conducting an investigation thinks he cannot do so without breaching the confidentiality rules, that he should abandon the investigation and notify the requester of the problem. But this investigator went to an official of the Cameroonian government and presented to him two documents that the petitioner had produced in support of his asylum claim, and that's clearly predicated by the confidentiality regulations. Is it your view that the BIA made its clear error finding because the IJ had given the consular report too much credence? I believe that the BIA made that finding because it believed that the report clearly established that the two documents, the convocation and the warrant of arrest, were fraudulent. And if that's the case, then the credibility of the petitioner is undercut. Although the BIA never addressed the petitioner's argument or claim that there was a motive to lie, and the court official had a motive to lie in terms of where he was from. The BIA didn't refer to that, did it? I don't believe so. All right, we'll have you back on rebuttal. Thank you. May it please the court, Brian Byer on behalf of the Attorney General to respond. Judge Fuentes had the question, why couldn't the BIA come to the conclusion that it did? And that's exactly the point regarding this claim about the BIA's regulations. Our principal submission in our brief was that the issue was waived because it wasn't properly raised. And so the court doesn't have the government's full position on this issue. If the court would like to receive a supplemental brief, I'd be happy to submit one. But basically, the regulation does not require. There's nothing in the regulation. The board clarified on remand that there was nothing in the regulation expressed or implied requiring a remand to the IJ in this circumstance. What happened here is that the IJ made a credibility ruling. The BIA concluded that the IJ did not properly consider the documents, and the IJ's ruling was clearly erroneous. But are documents all that the IJ really was looking at? I mean, the IJ, under the BIA's own case law, the change in the standard has required the BIA to give heightened deference to the IJ, especially because of the IJ's ability to observe the witness, and also add significant force to the IJ's decision. The IJ looked at the documents, looked at the petitioner, considered everything, and came up with a credibility determination that the BIA then, on its own, disagreed with. Well, it did more than disagree with it. It found it clearly erroneous. Tell me exactly why it was the IJ, in believing what happened here, based upon the newspaper, based upon the observation, based upon the claims of Agrittani, as to the court official, what was clearly erroneous? Well, it was clearly erroneous. The board decision explains that the IJ rejected the CIA report based on pure conjecture and speculation. That's what the BIA decision says. And in this regard, I mean, it's important to emphasize that although there was a year between the time of the report, nearly a year, between the time that the report was submitted to the BIA and the time of the hearing upon remand from the BIA, where Mr. Agrittani had the opportunity to present evidence regarding the report, rebutting its conclusions and things, there was only argument offered. Mr. Agrittani testified in a very conclusional manner that he disagreed, that the investigator was biased against him and things like that, but there was no effort to present any evidence to actually rebut the investigator's finding or to further amplify the findings. I mean, just to give you an idea of what was not submitted, there was no evidence offered from the manager of the newspaper who said that he thought, that he believed that he'd heard of the watchman, even though there was a telephone number and a name attached to it. But it's underlocated. I mean, there was evidence that it actually existed. Well, there was a reference to one newspaper manager saying he'd heard of it or something like that. Well, but I mean, look at the paper. I mean, the BIA said it wasn't authentic. What about what has been provided, you know, from a documentary standpoint, doesn't look authentic? At least one person said it existed and knew where it was from. Now someone asked someone, they said they hadn't heard of it. What kind of undercutting is that of the authenticity? Well, Your Honor, the newspaper, perhaps that wasn't the best document to start with because that was – that's not the most important document. In fact, I think the BIA said that the investigator's report called into question or undermined the reliability of that evidence. The key documents here are the convocation and the warrant of arrest. All right. But those are susceptible to the same problem as we had in Isaguirre, where you have hearsay because you went – the investigator went to a court official who then says, oh, no, everything is always in French and that can't be right because the magistrate would have had to assign it. We don't have that court official. Isn't it, you know, susceptible to the same argument that we had in Isaguirre that this is hearsay and there is at least an arguable motive to lie? No, Your Honor. Why not? Well, the reason – there's two reasons. First of all, unlike in Isaguirre, there was ample opportunity for Mr. Albertabi and his counsel to seek some further clarification and investigation. He could have contacted – That's not the basis on which the BIA decided the case, is it? The failure of further proof? It was a reweighing of evidence, wasn't it? Well, Your Honor, the BIA concluded that the IJ failed to properly consider the documents. Right. And the IJ has to be – And made an ad as a result. The total adverse credibility – or the total credibility determination was clearly erroneous. Clearly erroneous. That's correct. Because the IJ concluded that the investigator's report was sufficiently reliable and trustworthy that it could be considered. Was that a proper role for the BIA? Yes, Your Honor. Why so? I mean, isn't that a factual determination? No, Your Honor. The question of the admissibility generally is a sort of legal determination. The same way that, you know, a district court sitting on a trial would make a determination as to admissibility. And as the court is aware, and as the iguana, the limitation on admissibility of evidence is through the due process clause. Well, that might support its clear error finding, but the BIA seemed to have gone beyond that and made an adverse credibility determination. Well, the adverse credibility determination, Your Honor, was based on the matter of OD precedent, which was that if an asylum applicant proffers false documents, fraudulent documents, that discredits the claim. And that's what the BIA said happened here. What did the IJ say about the documents? The IJ said that the investigator's report did not rule out the credit or did not discredit Mr. Agbertabi's claim. And in part, it was because there was questions about the bias of the investigator and other items that the immigration judge cited. But the board went through and explained in detail why it was that that was based on speculation and conjecture and not on evidence. In particular, the BIA said there was no evidence brought forward that prosecutors in Cameroon are notorious for disavowing knowledge of the warrants of arrest. The BIA explains over a couple of pages exactly how probative it viewed the investigator's report. This was not like Eze Agbuna, where the BIA was considering a letter of someone who was three times removed from an investigation. And the information regarding the manner of the investigation was not ever before the BIA so that it could conduct a meaningful analysis. The problem in these cases is that we don't have true adversary proceedings. And the information, the evidence is hard to gather in other countries. And we always have, in effect, a series of ex parte proceedings where it's difficult to test the credibility or the accuracy of this information. In any event, your position is that we're bound under our standard of review. We're bound by the BIA's finding of clearly erroneous. Your Honor, under the standard of review, the court is obliged to affirm the asylum denial unless it concludes that any reasonable trier of fact would be compelled to find that Mr. Agbutabi is credible. The IJ did so, didn't he? Pardon? The IJ did so. He did, and the BIA explained that the IJ... But he's not a reasonable adjudicator then? He based it on speculation and conjecture. Well, he gave the report. He analyzed the various sections of the report and weighed the information presented and considered the manner in which the investigator obtained the information and came to his conclusion. Why would that be entitled to deference, a factual finding by the BIA? Your Honor, the deference, I think as the court has indicated earlier, the deference is particularly appropriate when you're talking about testimonial matters and matters of demeanor and things like that where, in fact, the Attorney General's regulations explain that the deference is really on account of the fact that it's testimonial and the BIA is not in as good a position to evaluate the CIJ. That's exactly right. Yes. But here, we're not talking about an evaluation of testimony. The BIA said under our precedent matter of OD, the submission of fraudulent documents discredits a claim, and it's entitled to draw that inference. And following its precedent decision, it explained that for the various reasons it gave, the IJ's credibility determination was clearly erroneous, and it's entitled to do that. The question, I guess, with respect to the scope of review regulation is, is it necessary when there's documents presented that are demonstrated by an investigator's report to be fraudulent, and the BIA concludes that those that discredit the claim, is it necessary to send the case back to the IJ for entry of a final decision? And the answer to that, I mean, the BIA said there's nothing... Well, the thing is that the IJ not only considered the documents and weighed the documents, but also considered Edward Tovey's testimony, so that it had the benefit of listening to the testimony to weigh the credibility of the alien together with the documents that were presented. But the BIA didn't have the benefit of that. The comment, you say that 10... I think it's 1003. Sorry? Section 1003 doesn't explicitly lay out the BIA's role, but it does, the comment to it says that the immigration judges are better positioned to discern credibility and assess the facts with the witnesses before them. I think you recognize that. You pretty much stated that before. Yes, Your Honor. But that's exactly what happened here. You have testimony presented to the IJ together with reports that the IJ felt were not entitled to much weight. Correct, Your Honor, but based on speculation and conjecture. I mean, Mr. Edward Tovey's counsel made arguments. He did not proffer evidence. And going back to the point about how this is, to judge Skirka's point about how this is not an adversarial proceeding, that may be true in some cases, but the record in this case shows that Mr. Edward Tovey had ample opportunities to present evidence to substantiate all this. Well, he presented his evidence. The IJ said the last piece of evidence was submitted after the closing of the testimony. A copy was distributed to the service. The service to date has not rebutted it, which leads me to believe that before the IJ, the service was content to have it as it was and permit the IJ to speculate. Did the service say it's speculative? Did it challenge the evidence before the IJ? It didn't have the evidence before the IJ. No, no, no, it did later on. There was a later hearing and it was distributed to the service and that's what the IJ's opinion went to the BIA and said the service to date has not rebutted it. What did the Attorney General do before the IJ when that evidence was presented and Edward Tovey said, you know, this is the evidence? Your Honor, let me suggest that the IJ's decision is a really rather unusual decision in that it consists of a number of appendices to the original decision and the part that I believe you're referring to, Your Honor, is the very first decision. If you look at it, you'll see that there's a repetition of each part of the decision. It says proceedings after remand, proceedings after remand. It's the entire decision just with each additional finding appended to it. It's not the IJ in the last decision did not say the service has not rebutted the evidence because that was the statement from years earlier. All right, I see where you are. I'm in the decision, but you're right from a procedural standpoint. It is your position that once the BIA makes a clear error determination, it can go on to make its own factual findings in certain cases? Your Honor, if the IJ has not, I'll have to answer your question this way, if the IJ has not made a finding of facts and the BIA considers it necessary to have that finding of facts, then it must remand the case. Overturning a credibility ruling is not necessarily the same thing and here particularly where it's on the basis of documents found to be fraudulent. Well, it was a factual finding. The BIA said that the IJ clearly erred and by the way, we find that the documents were fraudulent and we find that the petitioner is not credible. Under your view, that's a proper way for the BIA to proceed? Yes, Your Honor. The BIA is equally suited to the IJ to evaluate the authenticity of the documents based on the investigative report. So the BIA can find facts if the IJ does not find facts that are necessary for its decision? No, Your Honor. I don't agree with that formulation. If there's, I'll give you an example. Let's say that there's a claim of persecution by, if there's a finding of facts, say, in fact there's an Eighth Circuit case about this. If there's a finding of fact regarding a non-governmental persecutor and the IJ hasn't made a determination as to whether the government is unwilling or unable to protect the applicant from that persecutor, that's the sort of determination that the BIA cannot make itself. The BIA would need to send it back to the IJ to make that determination. And as the Court will see in reviewing the various decisions, the BIA in a prior decision said the IJ has not made a number of determinations and we're sending it back for that purpose. At this point, there's no reason to send it back. Okay. Thank you. Thank you. Thank you very much, Mr. Byer. Mr. Doolittle, any rebuttal? Thank you. Whether or not the documents, the two documents that we're referring to were fraudulent is a factual finding. And in essence, what the Board of Immigration Appeals did was substitute its factual finding for the factual finding of the immigration judge. The immigration judge did not, as is mentioned in the BIA decision and mentioned several times in the government's brief, did not reject the report. The judge did admit the report into evidence. However, considered the report and the different aspects of the report in the light of the conditions existing at the time in the country of Cameroon, and determined that with respect to the two documents that were presented to the Court Magistrate, that in his opinion, considering not speculation, considering the information that the IJ had at its disposal through U.S. Department of State country reports, through the testimony of the petitioner who did in fact testify at one of the hearings regarding those documents after the case was sent back from the BIA, the judge considered that. The petitioner testified that, for example, the officer said that it's pure invention because the document is not in French. And the petitioner indicated that Cameroon is a bilingual country and that the documents are not purely in French. They're in French and in English. He also testified regarding the fact that the court officer would know immediately that he was an Anglophone by virtue of his name. So the judge did consider the report, carefully considered the report, determined that with respect to the information received from the Cameroon government official, that he was not accepting that, as stated, as the BIA did, was skeptical about that information, looked at the report and saw that the newspaper article was issued by a newspaper publisher in Cameroon, which in fact existed. The report goes on to say that the investigator attempted to speak to people, did not indicate who he spoke to, whether he spoke to them on the phone, whether he traveled to the southern part of Cameroon, which is where the newspaper supposedly was issued or published, did not give any details with respect to what further attempts he made to establish or not the existence of that newspaper. When compared to the report that was prepared in the other case, this is actually a pretty good report when you put them side to side. It's a lot more thorough. The methodology was stated in the report. Some of the people were identified that the reporter spoke to. How far do you have to go in getting these reports in different countries to provide claims that are presented here? I would agree with that assessment as far as the hearsay aspects of the report, and there was some detail provided in this report. However, clearly the investigator in this report breached the confidentiality rules. He did mention specified names, and that's a point that I wanted to make. One of the two names that he mentioned in the report was the name of the manager of the Post newspaper, who corroborated the existence of the newspaper that issued the article. The other point I would like to make is that the government had the original newspaper in its possession and could have sent the newspaper for forensics testing, which it has the ability to do, but didn't do it. There was this doubt in their mind that this newspaper was legitimate. The newspaper possibly could have been resolved by actually having the newspaper itself examined by a forensics examiner, which it didn't do. Anything else? That's all. Good. The case was very well argued. We will take this matter under advisement. Thank you very much.